UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ANTHONY CABOT TURNER, SR.,          )
                                    )
                Plaintiff,          )
                                    )
        v.                          )    No. 4:05CV181 CAS
                                    )                (FRB)
JO ANNE B. BARNHART,                )
Commissioner of Social Security,    )
                                    )
                Defendant.          )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

        This cause is on appeal for review of an adverse
determination by the Social Security Administration.  All pretrial
matters were referred to the undersigned United States Magistrate
Judge pursuant to 28 U.S.C. § 636(b) for appropriate disposition.

## I.  Procedural Background

        On December 22, 1999, plaintiff Anthony Cabot Turner,
Sr., filed an application for Disability Insurance Benefits
pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401,
et seq., in which plaintiff claimed he became disabled on September
16, 1999. (Tr. 78-80.)  On initial consideration, the Social
Security Administration denied plaintiff's claim for benefits.
(Tr. 43, 56-60.)  On April 13, 2001, a hearing was held before an
Administrative Law Judge (ALJ).  Plaintiff testified and was
represented by counsel.  Plaintiff's spouse also testified at the
hearing. (Tr. 21-42.)  On May 2, 2002, the ALJ issued a decision

denying plaintiff's claim for benefits. (Tr. 8-20.) On November 26, 2004, the Appeals Council denied plaintiff's request to review the ALJ's decision. (Tr. 4-6.) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

A. <u>Testimony of Plaintiff</u>

At the hearing on April 13, 2001, plaintiff testified in response to questions posed by counsel and the ALJ. Plaintiff is fifty-one years of age. He stands five feet, ten inches tall and weighs 279 pounds. Plaintiff graduated from junior college with an associate's degree in liberal arts and has had vocational training as a practical nurse. (Tr. 24.) Plaintiff lives in his home with his wife and twenty-three-year-old son. Plaintiff has a nineteen-year-old son who attends college. (Tr. 23.)

From 1982 through 1989, plaintiff worked as a chauffeur providing transportation for the St. Louis Airport. (Tr. 128.) Plaintiff testified that such work involved lifting luggage for his customers. (Tr. 33.) From November 1990 through September 1999, plaintiff worked as a Licensed Practical Nurse with the Missouri Department of Mental Health. (Tr. 128.) Plaintiff testified that such work involved heavy lifting in that he had to be able to lift clients. (Tr. 33.) Plaintiff testified that he stopped working in September 1999 because of a back injury sustained from a fall at work. (Tr. 25.)

Plaintiff testified that he experiences pain in the upper portion of his back between the shoulder blades. (Tr. 25.) Plaintiff testified that if he engages in bending motions, the pain radiates down his back and to the side under his armpit. Plaintiff testified that he does not currently use a back brace but that he uses a cane prescribed for him for balance. (Tr. 26.) Plaintiff testified that twisting motions also aggravate his back pain. (Tr. 26-27.) Plaintiff testified that he visits his doctor every three months for his back condition. (Tr. 34-35.)

Plaintiff testified that he also suffers from sleep apnea and that he uses a CPAP machine which helps the condition. Plaintiff testified that he is sometimes groggy during the day because of insomnia. (Tr. 32.)

Plaintiff testified that he can walk approximately 150 feet before he gets winded. Plaintiff testified that he also feels the pain intensify in his left side. Plaintiff testified that he can stand in one position for approximately fifteen minutes and then must move around. Plaintiff testified that he must eventually sit or lie down. (Tr. 27.) Plaintiff testified that he can sit for up to thirty minutes before having to change positions. (Tr. 28.) Plaintiff testified that he can drive, but only short distances. (Tr. 34.)

As to his daily activities, plaintiff testified that he gets up in the morning, washes and then has a bowl of cereal. Plaintiff testified that after approximately one and one-half

hours, he lies down again. (Tr. 28.) Plaintiff testified that he lies down periodically throughout the day for approximately fifteen minutes to wiggle and go through his stretching routine. (Tr. 28-29.) Plaintiff testified that he may lie down for a longer period of time if he is watching television. (Tr. 29.) Plaintiff testified that he performs household chores such as laundry, washing dishes and putting the dishes away. (Tr. 30-31.) Plaintiff testified that he sometimes goes grocery shopping but that he has help carrying the bags. (Tr. 31.) Plaintiff testified that he likes computers and likes to read and that he plays chess as a hobby. (Tr. 32, 34.) Plaintiff testified that he belongs to a fraternal organization and attends church at least twice a month. (Tr. 35-36.)

Plaintiff testified that he attends Narcotics Anonymous and undergoes counseling for drug involvement. Plaintiff testified that his last episode with illicit drugs occurred the previous December and involved crack cocaine. Plaintiff testified that he has consumed alcohol since that time. (Tr. 36.)

Plaintiff testified that he investigated the possibility of engaging in sedentary work from his home as well as the possibility of obtaining a four-year college degree with home study. (Tr. 37.)

B.  Testimony of Plaintiff's Spouse

Dorothy Jean Turner, plaintiff's spouse, testified at the hearing in response to questions posed by the ALJ and counsel.

Mrs. Turner testified that while plaintiff performs the household chores to which he testified, he nevertheless experiences pain while doing so and needs to be able to lean on something during such activities.  Mrs. Turner testified that plaintiff can sit for about an hour and a half and then complains of back pain.  (Tr. 39.)  Mrs. Turner testified that plaintiff cannot drive longer than forty-five minutes because he gets tired behind the wheel.  Mrs. Turner also testified that plaintiff has recently developed an urgency to go to the bathroom, testifying that during the previous eight months, plaintiff has had a need to go approximately every hour.  (Tr. 40.)

Mrs. Turner testified that plaintiff also suffers from depression in that he believes that his "manhood[ is] gone" since his back surgery.  Mrs. Turner testified that plaintiff has mood swings and that his depression causes him to scream and yell at his family.  (Tr. 41.)  Mrs. Turner testified that while she is at work, she sometimes calls plaintiff's mother to have her check on him.  (Tr. 41-42.)

### III.  Medical Records

On July 27, 1999, plaintiff visited Dr. David Kantor complaining of lower back pain and heaviness in his legs.  It was noted that plaintiff fell while playing softball.  Plaintiff also requested that his CPAP machine be evaluated because he was having difficulty sleeping.  Upon physical examination, plaintiff was diagnosed with lumbar radiculopathy.  Plaintiff was instructed to

visit Dr. Ravi Yadava for consultation. (Tr. 275.) Subsequent x-rays of the lumbar spine were normal. (Tr. 283.)

On August 2, 1999, plaintiff underwent MRI imaging of the lumbar spine and pelvis in response to complaints of low back pain and right hip and leg pain. The MRI showed degenerative change with minimal central prominence of the L5-S1 disc which did not result in nerve root or thecal sac compression. (Tr. 357.)

Plaintiff was examined by Dr. Ravi Yadava on August 3, 1999, in response to plaintiff's complaints of low back pain and right lower extremity pain. (Tr. 344-47.) Plaintiff reported that he strained his low back in May 1999 and has experienced ongoing pain since that time. Plaintiff reported that he subsequently experienced a similar strain injury for which he received chiropractic treatments, which he believed did not help him. Plaintiff reported that he has been off of work and was not engaged in any type of therapeutic exercise program. Plaintiff reported that exercise increases his pain. Plaintiff reported that he experiences pain every day, twenty-four hours a day, and that his pain is aggravated by most activities, including bending forward or backward or to the side, walking, and lying down. (Tr. 347.) Plaintiff also reported, however, that while he experiences pain, he obtains moderate relief from pain killers and that he can walk any distance, lift heavy weight, sit in any chair, and travel with no extra pain. Plaintiff reported that he can stand for an unlimited amount of time, but that he experiences extra pain as a

result.  Plaintiff also reported that pain does not disturb his sleep.  (Tr. 346.)  Plaintiff reported feeling fatigued throughout the day and that he does not get restful sleep.  It was noted that plaintiff uses a CPAP machine but that his condition had not been checked in some time.  Dr. Yadava reviewed x-rays which were noted to be unremarkable, within normal limits, and showed no profound degenerative changes.  (Tr. 347.)  Plaintiff also reported feelings of depression and hopelessness, with low energy and trouble sleeping.  Plaintiff reported not having a history of drug abuse, but that he has had someone complain about his drinking or drug use.  (Tr. 346.)  Upon conclusion of the physical examination, Dr. Yadava diagnosed plaintiff with right SI joint dysfunction, bilateral piriformis syndrome, bilateral gluteus medius weakness, sleep apnea, and chronic pain.  (Tr. 345.)  Plaintiff was instructed to participate in physical therapy and a water walking program.  Plaintiff was also instructed to undergo a sleep study. Plaintiff was prescribed Daypro[1] and Zanaflex[2] and was instructed to return in two weeks for follow up.  With respect to plaintiff's work status, Dr. Yadava restricted plaintiff from only repetitive bending, stooping or squatting.  Dr. Yadava indicated that plaintiff should obtain two ten-minute breaks for flexibility and

---

[1]Daypro is indicated for acute and long-term use in the management of signs and symptoms of osteoarthritis and rheumatoid arthritis.  Physicians' Desk Reference 2993-94 (55th ed. 2001).

[2]Zanaflex is a short-acting drug for the management of spasticity.  Physician's Desk Reference 670-71 (55th ed. 2001).

stretching exercises, and be permitted to change position as needed. (Tr. 344.) Dr. Yadava reported to Dr. Kantor that plaintiff indicated a desire to stay off of work through August 10, but that such action was not warranted based on the results of physical examination. (Tr. 348.)

Plaintiff appeared at ProRehab for physical therapy on August 9, 1999. (Tr. 246-52.) Plaintiff complained of pain in the right side of the groin, weakness in the right lower extremity, soreness in the low back, and lack of coordination with his gait. (Tr. 246.) The therapist noted plaintiff's signs and symptoms to be consistent with lumbar spine strain/sprain. A treatment plan was put in place to include physical therapy and a home exercise program. (Tr. 247.)

On August 10, 1999, plaintiff failed to appear for a scheduled appointment with Dr. Kantor. (Tr. 273.)

On August 12, 1999, plaintiff reported to his physical therapist of continued pain in his back and of his knee giving way. It was noted that plaintiff underwent and tolerated the therapy well. On August 13, plaintiff reported decreased back pain and increased strength in his right leg. Plaintiff tolerated the therapy session well with no complaints of back or lower extremity pain. On August 16, plaintiff reported an improvement in his symptoms, although he complained of "deadness" in his left leg. Plaintiff tolerated the therapy session well with no complaints of back or lower extremity pain. On August 17, plaintiff complained

of pain branching down the back of his right hip as well as continued discomfort in the low thoracic region. The therapy session was noted to go well and plaintiff was demonstrating independence in his exercise performance. (Tr. 245.)

Plaintiff returned to Dr. Yadava on August 17, 1999, for follow up examination. Plaintiff reported feeling forty to fifty percent better. It was noted that plaintiff had not yet followed up with Dr. Kantor regarding further sleep studies. Dr. Yadava noted that plaintiff's physical therapist reported objective and subjective improvement in plaintiff's condition. (Tr. 344.) Range of motion of the lumbar spine was noted to be markedly improved. Upon physical examination, plaintiff was diagnosed with right SI joint dysfunction, improved; bilateral piriformis syndrome, resolved; bilateral gluteus medius weakness, improved; sleep apnea; and chronic pain. Plaintiff was instructed to continue with his medications and therapeutic exercises. (Tr. 343.) Plaintiff was encouraged to be more diligent and progressive with his rehab program. (Tr. 342.) Dr. Yadava determined plaintiff to have no restrictions with his work. (Tr. 343.)

Plaintiff followed up with Dr. Kantor on August 18, 1999 (Tr. 273), but did not appear that date for his scheduled physical therapy appointment (Tr. 243).

On August 20, 1999, plaintiff participated in physical therapy with decreased complaints of lower back pain. (Tr. 243.) Plaintiff tolerated the therapy session well with no complaints of

back or lower extremity pain.  On August 23, plaintiff failed to appear for his scheduled therapy appointment.  On August 25 and 27, plaintiff appeared for therapy and complained of moderate low back pain and minimal right piriformis pain.  Plaintiff tolerated the therapy sessions without complaints of low back pain and reported mild pain relief post-therapy.  (Tr. 243.)  On August 30, plaintiff reported decreased back pain and intermittent right piriformis/ buttock pain.  (Tr. 241.)

Plaintiff underwent a sleep study at Forest Park Hospital on September 6, 1999.  (Tr. 327-32.)  Plaintiff reported that he sometimes has difficulty falling asleep but that he has no sleep awakenings during the night while on the CPAP machine.  (Tr. 327.) Plaintiff reported being tired during the day but not sleepy since on the CPAP machine.  Results of the sleep study showed plaintiff to have severe obstructive sleep apnea, with significant improvement while using the CPAP.  (Tr. 328.)  It was noted that plaintiff experienced a severe amount of periodic leg movements during sleep.  An adjusted CPAP machine was prescribed for plaintiff, and plaintiff was instructed to begin a weight reduction program and to avoid alcohol and other depressants.  It was noted that upper airway surgery may be warranted if compliance with the CPAP was poor.  (Tr. 329.)

Plaintiff returned to ProRehab on September 7, 1999, and complained of moderate low back pain and minimal right piriformis pain.  Plaintiff had full range of motion and it was noted that

plaintiff was ambulating with less antalgia post-treatment. On September 8, plaintiff reported increased pain due to increased demands and walking at work. Plaintiff tolerated the therapy session without complaint of increased back pain. Plaintiff continued to complain of mild to moderate pain post-treatment. (Tr. 241.)

Plaintiff returned to Dr. Yadava on September 10, 1999, for follow up. Plaintiff reported that he continues to experience thigh numbness and tingling on the left side. Plaintiff was requesting a handicap sticker. Plaintiff complained of feeling weaker which, Dr. Yadava noted, was inconsistent with the reports from physical therapy. Plaintiff reported feeling better since his last visit, and that he felt about twenty to thirty percent improved. Plaintiff reported that a recent sleep study showed him to have severe sleep apnea and that a new CPAP machine had been ordered. (Tr. 342.) Physical examination showed plaintiff to be in mild to moderate distress. Plaintiff displayed symptom magnification and pain behavior throughout the exam. (Tr. 341-42.) Plaintiff was diagnosed with right SI joint dysfunction, improved; bilateral piriformis syndrome, improved; bilateral gluteus medius weakness, minimally improved; sleep apnea; and chronic pain. Plaintiff was instructed to continue with his medications and to be more diligent with his exercise program. An electrodiagnostic study was ordered to rule out a neurogenic basis for plaintiff's pain and impairment. (Tr. 341.) Plaintiff's work status was noted

to be unchanged. (Tr. 341.) Dr. Yadava emphasized that getting the CPAP machine and sleep apnea managed would assist in improving plaintiff's overall condition. (Tr. 340-41.)

Plaintiff appeared for an electrodiagnostic study on September 14, 1999. (Tr. 338-40.) Dr. Yadava noted plaintiff to be walking with crutches, which Dr. Yadava observed plaintiff to use improperly but opined that they nevertheless may provide balance support. (Tr. 340.) The electrodiagnostic study showed findings compatible with spinal stenosis and tarsal tunnel syndrome with the level of severity noted to be moderate to severe. Dr. Yadava ordered a CT myelogram to further evaluate the conditions. (Tr. 339.)

Plaintiff was admitted to the emergency room at St. Mary's Health Center on September 16, 1999, after having fallen at work. Plaintiff complained of pain in his right knee and about the left aspect of his neck. Plaintiff's past medical history was noted to include sleep apnea for which he used a CPAP machine, and back injury. Plaintiff's current medications were noted to include Verapamil,[3] aspirin, HCTZ,[4] Naprosyn,[5] and a sleeping pill. Films

---

[3]Verapamil is indicated for the treatment of angina, arrhythmias, and essential hypertension. Physicians' Desk Reference 2981 (55th ed. 2001).

[4]HCTZ (Hydrochlorothiazide) is indicated for the treatment of hypertension. Physicians' Desk Reference 2417-18 (55th ed. 2001).

[5]Naprosyn is indicated for the treatment of rheumatoid arthritis, osteoarthritis and ankylosing spondylosis. Physicians' Desk Reference 2744-45 (55th ed. 2001).

of the lumbo-sacral spine and of the left wrist showed normal alignment and no fractures. Plaintiff was diagnosed with lower back pain/strain and was discharged that same date with instructions to rest and apply heat to the affected area. Plaintiff was instructed to take Naprosyn/Flexeril[6] as needed. Plaintiff was given a lifting precaution but was otherwise advised that he could engage in other activity as tolerated. Plaintiff was referred to Occupational Medicine for follow up. (Tr. 351.)

Plaintiff did not appear at ProRehab on September 17, 1999, for a scheduled appointment. (Tr. 241.)

Plaintiff returned to Dr. Yadava on September 21, 1999, who noted plaintiff's recent fall at work. (Tr. 338.) Plaintiff was noted to continue to use crutches. Dr. Yadava noted the CT myelogram to show a T9-10 disc herniation which was central and impacting onto the thecal sac. (Tr. 321-22, 338.) Dr. Yadava recommended that plaintiff be seen by Dr. Michael Chabot, a spine surgeon, as soon as possible. Plaintiff was prescribed Medrol-Dosepak[7] and was instructed to stay off of work until evaluation by Dr. Chabot. (Tr. 338.)

_____

[6]Flexeril is indicated as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute, painful musculoskeletal conditions. Physicians' Desk Reference 1929 (55th ed. 2001).

[7]Medrol relieves inflammation (swelling, heat, redness, and pain) and is used to treat certain forms of arthritis, skin and kidney disorders, severe allergies, and asthma. Medline Plus (last revised Apr. 1, 2003)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682795. html>.

Plaintiff was evaluated by Dr. Chabot on September 22, 1999. (Tr. 191-92.) Dr. Chabot noted plaintiff to primarily complain of numbness over the lower portion of the body with heaviness and diminished function of the lower extremities. Plaintiff complained of some degree of back pain with no radiation to the lower extremities. Plaintiff reported his history of physical therapy and medication with no significant improvement in his symptoms. (Tr. 191.) Dr. Chabot noted plaintiff not to use an assistive device to ambulate. Plaintiff reported having first experienced his current symptoms in April 1999 with right sided lower lumbar back pain and that in July 1999, he began developing symptoms in his lower extremities. Plaintiff reported his symptoms to have progressed since that time. Upon physical examination and review of the diagnostic tests, Dr. Chabot diagnosed plaintiff with thoracic spinal stenosis and myelopathy. It was determined that plaintiff would undergo a thoracic MRI upon which further recommendations would be made. (Tr. 192.)

An MRI of the lumbar spine taken September 27, 1999, showed large disc herniation T9-T10 lateralizing to the left within the canal with effacement of the cord. Associated signal alteration within the cord compatible with myelopathic change or possibly cord contusion was noted, as well as additional degenerative changes. (Tr. 334.)

Plaintiff returned to Dr. Kantor on September 29, 1999. Plaintiff's history regarding his recent fall and treatment was

noted.  An ECG was ordered and plaintiff was instructed to follow through with Dr. Chabot.  (Tr. 271.)

On September 30, 1999, Dr. Chabot recommended to plaintiff that he undergo surgery with a transthoracic corpectomy at T9-10 with spinal cord decompression and fusion.  (Tr. 188.)

An ECG performed on October 8, 1999, was abnormal and revealed results consistent with ischemia.  (Tr. 318.)  X-rays taken that same date showed mild scoliosis of the lower thoracic spine. (Tr. 317.)  Stress tests performed October 12, 1999, showed no abnormality.  (Tr. 315-16.)

Plaintiff underwent surgery on October 14, 1999, performed by Dr. Peter Fonseca at Deaconess Hospital during which a transthoracic corpectomy of the T9 and T10 was performed, as well as anterior spinal fusion from T9 to T10 using rib grafts from the eighth rib which was removed, and anterior thoracic plating from T9 to T10.  (Tr. 290-95.)  Plaintiff was discharged on October 25, 1999.  Upon discharge, plaintiff was encouraged to walk and was instructed to avoid stairs and not to lift over five pounds.  (Tr. 288.)

An ECG performed October 25, 1999, showed nonspecific ST abnormality.  (Tr. 301.)

Plaintiff visited Dr. Kantor on October 27, 1999, for follow up examination.  It was noted that plaintiff's surgical scar was healing and intact.  Dr. Kantor noted plaintiff needed to participate in outpatient physical therapy.  Plaintiff also

reported feeling depressed. Dr. Kantor noted plaintiff to be very tearful. Dr. Kantor diagnosed plaintiff with depression and obesity and Prozac[8] was prescribed. (Tr. 270.)

Plaintiff visited Dr. Fonseca on November 3, 1999, for follow up examination who noted plaintiff to be doing fairly well overall. Plaintiff's incision site was noted to be clear of infection. Plaintiff was instructed to follow up in two weeks. (Tr. 266.)

On November 10, 1999, plaintiff visited Dr. Kantor and reported that Prozac was helping him but that he had recently run out of the medication. Plaintiff also reported that his pain was better but that it was still present. Dr. Kantor noted plaintiff to have a good attitude. Dr. Kantor continued in his diagnosis of depression and obesity, and an additional prescription for Prozac was given. (Tr. 270.)

Plaintiff visited Dr. Chabot on November 11, 1999, who noted plaintiff to be doing very well. Plaintiff ambulated with a walker, but Dr. Chabot noted plaintiff's lower extremity strength to be markedly improved. Neurologic examination showed essentially symmetric motor strength and no spasticity in the lower extremities. X-rays showed satisfactory position of the spinal implants and maturation of the fusion graft. Dr. Chabot instructed

---

[8]Prozac is indicated for the treatment of depression and for the treatment of obsessions and compulsions in patients with obsessive-compulsive disorder. Physicians' Desk Reference 1127-28 (55th ed. 2001).

that plaintiff use a cane instead of a walker and recommended that plaintiff begin physical therapy. (Tr. 186.)

Plaintiff returned to Dr. Fonseca on November 17, 1999, who noted plaintiff's incision to be healing nicely. Plaintiff was instructed to return in four weeks. (Tr. 265.)

Plaintiff appeared at ProRehab on November 19, 1999. Plaintiff complained of pain, decreased mobility, decreased balance, and decreased strength in both legs. Plaintiff indicated his goal to be to return to work without pain. (Tr. 239.) Physical examination showed tenderness about the left flank along the incision site. Plaintiff had full range of motion with forward bending, bilateral side bending and bilateral rotation. Range of motion was measured to be eighty percent with backward bending. Sensation of the left and right lower extremities was noted to be diminished. Plaintiff had decreased muscle strength of the iliopsoas, quadriceps and anterior tibialis. Straight leg raising was negative. Upon conclusion of the physical examination, it was noted that plaintiff's complaints of pain were "grossly out of proportion to objective signs." (Tr. 238.) The physical therapist assessed plaintiff as exhibiting the signs and symptoms of status-post thoracic spine discectomy with symptom magnification and a conditioning and exercise program was formulated. (Tr. 237.)

Throughout November 1999, plaintiff appeared for physical therapy and complained of moderate to severe back pain. Plaintiff was able to tolerate the therapy sessions without complaints of

increased pain and it was noted that plaintiff had increased his walking at home. (Tr. 236.)

On December 1, 1999, plaintiff appeared at physical therapy and complained of increased pain with his upper back and left flank. Plaintiff reported that he had been very active in rehabing his rental house. Plaintiff tolerated the therapy session without increase in upper back pain, and reported a mild decrease in such pain post-therapy. (Tr. 236.) Plaintiff failed to appear for a scheduled therapy session on December 3, 1999. On December 6, plaintiff appeared at physical therapy and reported that he had mild back pain but that the pain increased over the weekend with activities. It was noted that plaintiff continued to use a walker. The therapist observed plaintiff to have "numerous contradictions in evaluated movements vs. informal observation" in that plaintiff's "[t]ransitional movements indicate near normal [range of motion] and functional abilities." (Tr. 235.) Plaintiff tolerated the therapy session without complaints of back pain. On December 8, plaintiff reported moderate to severe left flank pain but attributed such pain to his failure to take pain medication prior to therapy. On December 9, it was noted that plaintiff had no new complaints but continued to have difficulty with balance and control and gait. Plaintiff was observed to almost fall from the bicycle during his therapy session, but that he was able to catch himself. (Tr. 235.)

On December 10, 1999, ProRehab reported plaintiff's

course of physical therapy to Dr. Chabot and specifically noted that inconsistencies between plaintiff's physical condition and subjective complaints and "his persistent severe complaints of pain without identifiable cause make further progression in rehabilitation extremely guarded at this time." (Tr. 234.)

Plaintiff returned to Dr. Kantor on December 10, 1999, who noted plaintiff to be walking with an unsteady gait and using a cane. Plaintiff reported that he was "healing but wobbly." Plaintiff's medications were noted to include Motrin, Prozac, Verapamil, and Ultram.[9] Plaintiff was given a prescription for Atenolol.[10] Plaintiff was also instructed to continue with physical therapy. (Tr. 269.)

Plaintiff likewise returned to Dr. Chabot on December 10, 1999, who noted plaintiff to be doing very well. Dr. Chabot noted plaintiff to be making progress with physical therapy but that he had "a ways to go before regaining full stability involving the lower extremities." (Tr. 185.) Neurologic examination showed mild weakness involving the left hip flexors and quadriceps. X-rays showed satisfactory healing through the fusion site. Dr. Chabot recommended that plaintiff continue with his home exercise program and encouraged plaintiff to be more active with such exercises.

---

[9]Ultram is indicated for the management of moderate to moderately severe pain. Physicians' Desk Reference 2398-99 (55th ed. 2001).

[10]Atenolol is indicated for the treatment of hypertension. Physicians' Desk Reference 647 (55th ed. 2001).

Plaintiff was instructed to reduce his weight and to continue with physical therapy. (Tr. 185.)

Plaintiff returned to physical therapy on December 13, 1999, and complained of severe low back pain. It was opined that plaintiff continued to show behaviors consistent with a symptom-magnification-type illness in that plaintiff's observed transitional movements were greatly out of proportion with subjective signs. (Tr. 235.)

Plaintiff visited Dr. Fonseca on December 15, 1999, and reported that he had fallen in the entry of the building, but no effects were noted. Plaintiff reported that he still had some pain. Plaintiff was instructed to follow up in one month and to go the emergency room regarding this recent fall. (Tr. 264.)

Plaintiff went to the emergency room at St. Anthony's Medical Center on December 15, 1999, for follow up of his fall. (Tr. 254-57.) Plaintiff complained of pain in his right knee and in his ribs. Plaintiff complained of chest pain but reported that it was not different than that related to his recent surgery. (Tr. 255.) X-rays showed post-operative changes to the T8 and T9 with lateral plate, with such results noted to be unchanged from previous exams. (Tr. 257.) Plaintiff was diagnosed with right chest wall strain. (Tr. 255.) Plaintiff was instructed to apply ice to the affected area and to take Vicodin[11] for pain. (Tr. 255,

---

[11]Vicodin is indicated for the relief of moderate to moderately severe pain. <u>Physicians' Desk Reference</u> 1629-30 (55th ed. 2001).

256.)

Throughout the remainder of December 1999, plaintiff underwent physical therapy at ProRehab during which it was noted that plaintiff demonstrated inconsistencies in his range of motion in formal versus informal observations of movement. Discoordination of the lower extremities was consistently noted. (Tr. 233.) Plaintiff's last recorded therapy session occurred on December 28, 1999, where it was noted that plaintiff reported only minimal stiffness. Plaintiff tolerated the treatment without complaints of back pain. (Tr. 232.)

On January 14, 2000, Dr. Kantor's office noted that plaintiff's aunt had repeatedly called the office demanding that Dr. Kantor prepare a statement that plaintiff is unable to work for an unknown period of time. Plaintiff's aunt identified herself to Dr. Kantor's office as plaintiff's representative regarding disability. (Tr. 164.)

Plaintiff returned to Dr. Chabot on January 17, 2000, and reported that he was recently involved in a motor vehicle accident wherein he was struck from behind and now experiences neck pain and upper thoracic back pain. X-rays of the cervical spine showed no evidence of a fracture or dislocation. With respect to follow up of his corpectomy, plaintiff reported that he felt he was making significant progress with improving his strength and endurance; however, Dr. Chabot noted the physical therapist to report poor motivation and questionable compliance with home exercises. Dr.

Chabot noted plaintiff to be walking with a cane which plaintiff reported was necessary only for long distances and was not needed at home. Dr. Chabot noted plaintiff to move about the room in a relatively normal fashion. Dr. Chabot diagnosed plaintiff with cervical strain and recommended that plaintiff continue with physical therapy for two more weeks. Dr. Chabot emphasized to plaintiff that he needed to become more involved in his home exercise program, to lose weight and to ambulate for exercise. (Tr. 183.)

On January 17, 2000, Dr. Chabot reported to plaintiff's employer that plaintiff's post-operative rehabilitation had been slow but that plaintiff was making reasonable progress. Dr. Chabot informed the employer that plaintiff would most likely be released to work in four to six weeks. (Tr. 182.)

Plaintiff visited Dr. Kantor on January 17, 2000, and reported the motor vehicle accident in which he was involved. Plaintiff complained of having headaches. It was noted that plaintiff saw Dr. Chabot and was advised to take ibuprofen. Plaintiff reported that his CPAP was working well and that he got a new machine in October 1999. Dr. Kantor noted plaintiff's gait to be unstable and that plaintiff walked with a cane. Plaintiff was noted to be alert and pleasant. Plaintiff reported that he has decreasing pain. Plaintiff was diagnosed with sleep apnea and depression and was instructed to continue with Prozac and Atenolol. (Tr. 163.)

Plaintiff returned to Dr. Kantor on February 14, 2000, and reported that he sprained his left ankle while in his back yard. Dr. Kantor noted plaintiff to be less depressed. Tenderness was noted about the mid-thoracic and lumbosacral regions, as well as about the left ankle. Plaintiff's gait was noted to be better than the last visit. Plaintiff was diagnosed with hypertension, obesity, depression, thoracic radiculopathy, and left ankle sprain. Plaintiff was instructed to lose weight, to continue to use the cane and to continue on Prozac. (Tr. 162.)

Plaintiff visited Dr. Chabot on February 28, 2000. Dr. Chabot noted plaintiff to have progressed reasonably well and that plaintiff reported the weakness in his lower extremities to have somewhat resolved. Plaintiff reported improvement in his ability to ambulate longer distances but that he continues to ambulate with a cane. Dr. Chabot questioned how much exercise plaintiff conducts at home inasmuch as plaintiff had gained additional weight. Plaintiff reported some incision pain which becomes aggravated with more vigorous activity, with such pain moderated by pain medication. Dr. Chabot noted plaintiff to move about the room without significant difficulty and that plaintiff's neurologic examination was essentially normal. Dr. Chabot recommended that plaintiff continue his use of Vicodin but that he reduce his dosage. Dr. Chabot instructed plaintiff to advance his activities and to take a more active role in his home exercise program. Dr. Chabot indicated that he would now see plaintiff on an as needed

basis.  (Tr. 181.)

A reviewing, non-examining physician completed a Psychiatric Review Technique Form (PRTF) on March 13, 2000, for Disability Determinations, in which it was determined that plaintiff had no medically determinable mental impairment inasmuch as plaintiff had reported to Disability Determinations that medication completely relieved his symptoms.  (Tr. 110-19.)

On that same date, counselor Brandi Bickers completed a Residual Physical Functional Capacity Assessment for Disability Determinations in which she opined that by July 2000, that is, one year since the alleged onset date of disability, plaintiff should be capable of occasionally lifting and/or carrying fifty pounds; frequently lifting and/or carrying twenty-five pounds; standing or walking about six hours in an eight-hour workday; sitting for a total of about six hours of an eight-hour workday; and would have unlimited ability to push and/or pull including operation of hand or foot controls.  (Tr. 102-09.)  Ms. Bickers based this opinion upon her review of the medical evidence which included diagnostic testing, records from physical therapy, and records from Dr. Kantor and Dr. Chabot which showed improvement in plaintiff's strength and endurance, relatively normal movement, full range of motion, increased ambulation, and normal neurological functioning.  (Tr. 104, 107.)  Ms. Bickers also opined that plaintiff had no postural, manipulative, visual, or communicative limitations, but that plaintiff had an environmental limitation in that he should avoid

concentrated exposure to hazards due to his sleep apnea. (Tr. 105-06.)

Plaintiff visited Dr. Kantor on April 4, 2000, and reported that he experiences constant back pain but that he felt better. Plaintiff reported that Prozac helped his pain and aggression but that he felt he was "slowing down" on the medication. Dr. Kantor noted plaintiff to be alert but mildly depressed. Plaintiff's gait was noted to be slow and plaintiff continued to use a cane. Plaintiff was diagnosed with hypertension, depression and back pain. Dr. Kantor instructed plaintiff to stay off of Prozac and indicated that the condition would be checked in two months. Dr. Kantor noted that plaintiff was scheduled to see Dr. Fonseca on April 26 and that plaintiff was to see Dr. Yadava for rehabilitation. It was noted that plaintiff was unable to work yet and was getting disability. (Tr. 161.)

Plaintiff failed to keep a scheduled appointment with Dr. Kantor on June 5, 2000. (Tr. 159.)

Plaintiff returned to Dr. Kantor on September 5, 2000, and reported that he had gained weight due to his efforts to quit smoking. It was noted that plaintiff was pool walking. Plaintiff continued to use a cane. Plaintiff's medications were noted, including Prozac due to plaintiff's anger bursts at his son. Plaintiff was diagnosed with hypertension, depression and back pain and was instructed to continue with Dr. Yadava. (Tr. 159.)

Plaintiff visited St. Charles Psychiatric Associates

(SCPA) and met with Dr. Greg Mattingly, a psychiatrist, on November 7, 2000, for a neuropsychiatric evaluation regarding problems with depressive symptomatology. (Tr. 176-78.) Plaintiff reported his past medical history and that during the past year and a half, he has had recurrent problems with depression, low-grade mood, decreased energy, and feelings of hopelessness, apathy and low self-esteem because of residual neurologic deficits and chronic pain. Plaintiff reported that his use of Prozac provided partial improvement but that he continues to have problems with dysphoric symptoms. It was noted that plaintiff had a history of drug and alcohol abuse and that plaintiff recently had been drinking alcohol to intoxication several times a week and intermittently smoked crack cocaine. (Tr. 176.) Plaintiff's current medications were noted to include Calan,[12] Atenolol, Prozac, HCTZ, and potassium chloride. Dr. Mattingly noted that plaintiff was currently on disability. Mental status examination showed plaintiff's mood to be "okay" and his affect to be constricted. Dr. Mattingly noted plaintiff to appear somewhat dramatic. Plaintiff had no suicidal or homicidal ideation; no auditory or visual hallucinations; no paranoia or delusions; and no obsessions or compulsions. Plaintiff's train of thought was noted to be logical and sequential with judgment and insight noted to be fair. (Tr. 177.) Plaintiff was diagnosed with major depression, recurrent, moderate severity;

_____

[12]Calan is indicated for the treatment of angina, arrhythmias and essential hypertension. Physicians' Desk Reference 2981 (55th ed. 2001).

and polydrug use. Plaintiff was prescribed Zoloft[13] in place of Prozac and was referred to a psychologist for individual and possible marriage counseling. Plaintiff was instructed to return to Dr. Mattingly in one month. (Tr. 178.)

On November 10, 2000, plaintiff met with a psychologist at SCPA and reported that he had relapsed into crack cocaine use in March 2000. Plaintiff reported that he attended rehab in 1995, including NA meetings and AA meetings. Plaintiff reported that he currently received disability insurance benefits in the amount of $1,600.00 per month. (Tr. 175.)

On November 28, 2000, plaintiff returned to SCPA and reported that he had a one-day relapse ten days prior. Plaintiff discussed resentments, and it was recommended that plaintiff get treatment and attend NA meetings. (Tr. 174.)

Plaintiff failed to appear for a scheduled appointment with Dr. Kantor on December 5, 2000, and cancelled an appointment scheduled for December 12, 2000. (Tr. 157.)

On December 15, 2000, plaintiff reported to SCPA that he had contacted NA but had not received any calls back yet. Plaintiff reported that he may also attend Cocaine Anonymous. Plaintiff was strongly encouraged to attend the treatment meetings. (Tr. 174.) On December 26, 2000, plaintiff reported that he continued to maintain abstinence. Plaintiff reported that his

---

[13]Zoloft is indicated for the treatment of depression. Physicians' Desk Reference 2553-54 (55th ed. 2001).

continued attempts to attend NA meetings have been unsuccessful. It was noted that plaintiff's mood was good.  (Tr. 173.)

Plaintiff visited Dr. Kantor on December 20, 2000, and complained of abdominal pain in the right upper quadrant.  It was noted that plaintiff was taking ibuprofen for pain.  Plaintiff reported that he was seeing a psychiatrist for depression and narcotic addiction.  Dr. Kantor noted plaintiff's gait to have improved but that plaintiff continued to be slow and to use a cane. Plaintiff was instructed to discontinue ibuprofen and was prescribed Vioxx.[14]  Plaintiff was also instructed to lose weight. (Tr. 157.)

On December 28, 2000, plaintiff returned to Dr. Mattingly and reported that he has stayed away from cocaine.  Mental status examination showed plaintiff's mood to be "okay."  Plaintiff had no suicidal or homicidal ideation and hallucinations.  Plaintiff's insight and judgment were noted to be fair.  Plaintiff was diagnosed with depression and was instructed to continue with Zoloft.  Plaintiff was also diagnosed with spinal cord injury and was instructed to continue with Vioxx.  (Tr. 172.)

Plaintiff visited Dr. Kantor on January 22, 2001, and reported that he was fatigued but no longer had stomach pain.  It was noted that gallbladder surgery was tentatively scheduled for February 6, 2001.  Plaintiff reported pain in his abdomen on the

---

[14]Vioxx is indicated for the relief of signs and symptoms of osteoarthritis and for the management of acute pain.  Physicians' Desk Reference 2049-50 (55th ed. 2001).

left and that he had no feeling on the surface of his abdomen. Plaintiff also complained that his legs felt heavy. Plaintiff was instructed to continue with Vioxx. (Tr. 156.)

Plaintiff returned to Dr. Mattingly on March 1, 2001. Mental status examination showed plaintiff's mood to be "okay." Plaintiff had no suicidal or homicidal ideation and no hallucinations. Plaintiff's judgment and insight were noted to be fair. Dr. Mattingly continued in his diagnoses of depression and spinal cord injury and instructed plaintiff to continue with Zoloft and Vioxx. (Tr. 172.)

On May 7, 2001, Dr. Kantor completed a Medical Source Statement wherein he opined that plaintiff could occasionally lift and/or carry up to five pounds during a typical work day; could stand and/or walk continuously for forty-five minutes, for a total of three hours; could sit continuously for thirty-five minutes; and was limited in pushing and/or pulling with his legs due to occasional leg spasms. Dr. Kantor opined that plaintiff could never climb, balance, stoop, and/or crouch; and could occasionally kneel and bend. Dr. Kantor opined that plaintiff had no limitations with his hands or fingers. (Tr. 152.) Dr. Kantor opined that plaintiff had an environmental restriction in that he could not work around heights. As reasons for plaintiff's stated limitations, Dr. Kantor reported that plaintiff "had surgery on a thoracic disc T9-10. He is obese. He continues to be limited to a cane for ambulation." (Tr. 153.) To support this conclusion,

Dr. Kantor referred to the myelogram which showed T9-10 decompensation; plaintiff's weight of 291 pounds with a height of five-feet, ten-inches; and his observation of plaintiff's use of a cane. Reporting that plaintiff would benefit from reclining or lying down during the day, Dr. Kantor noted that plaintiff lies down at home for two hours. (Tr. 153.)

## IV. The ALJ's Decision

The ALJ found that plaintiff met the disability insured status requirements of the Social Security Act through the date of the decision. The ALJ found there to be no evidence that plaintiff engaged in substantial gainful activity since the alleged onset of disability. The ALJ determined plaintiff's impairments of herniated thoracic disc successfully treated with surgery, sleep apnea, drug abuse, and depression to be a severe combination of impairments but that such impairments, whether considered individually or in combination, did not meet or medically equal an impairment listed in Appendix 1, Subpart P, Regulations No. 4. The ALJ found plaintiff's allegations regarding his limitations not to be totally credible. The ALJ found that within less than twelve continuous months of plaintiff's alleged onset of disability, he regained the residual functional capacity to sit throughout the workday, stand and walk up to six hours a workday, lift and carry up to twenty pounds occasionally and ten pounds frequently, and push and pull on arm and leg controls. The ALJ found plaintiff able to perform his past relevant work as a chauffeur as such work

is generally performed in the national economy. Further, considering plaintiff's age, education, transferability of skills, and residual functional capacity to perform light work, the ALJ determined the Medical Vocational Guidelines to dictate a finding of not disabled. The ALJ thus determined plaintiff not to be under a disability at any time through the date of his decision.

## V. Discussion

To be eligible for Social Security Disability Insurance Benefits under the Social Security Act, plaintiff must prove that he is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). The claimant bears the initial burden of proof to show that he is unable to perform his past relevant work. Frankl v. Shalala, 47 F.3d 935, 937 (8th Cir. 1995). If this

burden is met, the burden of proof then shifts to the Commissioner to demonstrate that the claimant has the residual functional capacity to perform other work in the national economy. <u>Id.</u>

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. <u>See</u> 20 C.F.R. § 404.1520; <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence. 42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Estes v.</u>

Barnhart, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).

To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1.    The credibility findings made by the ALJ.

2.    The plaintiff's vocational factors.

3.    The medical evidence from treating and consulting physicians.

4.    The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.    Any corroboration by third parties of the plaintiff's impairments.

6.    The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th

Cir. 2000)). A Commissioner's decision may not be reversed merely because substantial evidence also exists that would support a contrary outcome. <u>Jones ex rel. Morris v. Barnhart</u>, 315 F.3d 974, 977 (8th Cir. 2003).

In his Complaint,[15] plaintiff claims that he is entitled to disability benefits inasmuch as:

> [He] is using C-PAP machine to stay alive while sleeping, State of MO-Work Comp-have declared me Disable [sic] . . . . Pain Control ("Tens" machine) for chronic pain [left] side of ribs, back sprinal [sic] cord injuries T-9, T-10, 3 screws and Plate on my spinal cord, paral[yzed] [left] front muscle which cause great discomforted [sic], lose control of bowel & bladder function, and suffering Major Depression.

(Compl. at p. 3.)

For the following reasons, the Commissioner's determination that plaintiff is not disabled should be affirmed.

A review of the ALJ's decision shows him to have thoroughly set out the evidence contained in the record as a whole and to have accorded appropriate weight thereto. To the extent it can be argued that the May 2001 Medical Source Statement of plaintiff's treating physician, Dr. Kantor, may provide a basis

---

[15]Plaintiff is proceeding in this cause <u>pro</u> <u>se</u>. On April 29, 2005, plaintiff was ordered to advise the Court whether he intended to pursue his claims based solely on the allegations made in his Complaint or whether he wished to submit a Brief in Support of the Complaint pursuant to Local Rule 9.02. Plaintiff never responded to this Order. In a separate Order entered June 9, 2005, the Court determined to proceed on the allegations made in plaintiff's Complaint and ordered the Commissioner to respond accordingly.

upon which a finding of disability may be made, the ALJ properly accorded little weight to this opinion given its inconsistency with other assessments given by other treating physicians as well as the lack of persuasive support given by Dr. Kantor for his opinions. See Spradling v. Chater, 126 F.3d 1072, 1075 (8th Cir. 1997) (duty of Commissioner to resolve conflicts in the evidence); Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995) (duty to resolve conflicts includes medical evidence); 20 C.F.R. § 404.1527(d)(2) (for opinion of treating physician to be given controlling weight, it must be supported by medically acceptable clinical and laboratory diagnostic techniques and not be inconsistent with other substantial evidence in the record). Indeed, as an example, the ALJ noted that Dr. Kantor stated that his findings regarding plaintiff's limitations were supported, in part, by the myelogram which showed T9-10 decompensation; whereas the record showed plaintiff's spinal condition to have been successfully remedied by surgery and, indeed, that within a few months of surgery, plaintiff's treating surgical spine specialist opined that plaintiff could be released to work within four to six weeks. See Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997) (not improper to accord little weight to opinion of treating physician and to accord greater weight to opinions of specialists who treated claimant closer in time to period claimant asserted disability and during which claimant actually received treatment for medical problem). Accordingly, substantial evidence on the record as a

whole supports the ALJ's determination not to accord great weight to the findings made by Dr. Kantor in his May 2001 Statement. As found by the ALJ, no other medical evidence in the record supports a finding that plaintiff's impairments render him unable to perform work for a period of at least twelve months, and specifically, unable to perform past relevant work as a chauffeur as that work is performed in the national economy.

With respect to plaintiff's specific claims raised in his Complaint, the undersigned addresses each contention in turn:

A.  Use of CPAP Machine

In support of his claim for disability, plaintiff contends that his use of the CPAP machine is necessary to keep him alive. In his written decision, the ALJ recognized plaintiff's condition of sleep apnea and noted the condition to be treated with CPAP therapy. (Tr. 15.) The ALJ then found that plaintiff had worked with the condition of sleep apnea in the past and that the evidence failed to show that the condition has worsened since. Substantial evidence on the record as a whole supports this finding. A condition that was present but not disabling during working years and has not worsened cannot be used to prove a present disability. Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992) (per curiam); Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990). Further, nothing in the record shows that plaintiff's sleep apnea condition was not controllable with the CPAP machine, and indeed, plaintiff was prescribed and received a new CPAP

machine in October 1999 which plaintiff subsequently reported was working well.  A condition which is controllable through treatment is not considered disabling.  Estes, 275 F.3d at 725; e.g., Nelson v. Sullivan, 966 F.2d 363, 367 (8th Cir. 1992).

B.    Worker's Compensation Declaration of Disability

In support of his claim of disability, plaintiff claims that the State of Missouri, Worker's Compensation Division, has already determined him to be disabled.  It is well settled that determinations of disability made by other entities are not binding on the Social Security Administration.  20 C.F.R. § 404.1504.  Such determinations may be relevant, however, when considering a claimant's ability to perform past work to the extent the claimant's employer determines him not able to perform such work. See Kirby v. Sullivan, 923 F.2d 1323, 1327 (8th Cir. 1991).

A review of the ALJ's decision here shows him to have considered plaintiff's worker's compensation claim and the fact that plaintiff collects benefits in the amount of $1,600.00 per month. (Tr. 14.)  To the extent another agency may have determined plaintiff disabled on account of his work injury suffered as an LPN, the undersigned notes such determination not to be relevant to the ALJ's conclusion that plaintiff could engage in work as a chauffeur.  The ALJ here determined plaintiff's impairments to indeed prevent him from engaging in the work he performed at the time of his injury, that is, as an LPN, but that plaintiff could nevertheless perform his previous work as a chauffeur.  (Tr. 17-

18.) There is nothing in the record to indicate the Worker's Compensation Division's determination as to disability regarding plaintiff's ability to work as an LPN is relevant to a determination that plaintiff is able to perform his previous work as a chauffeur.

Accordingly, a determination of disability made by the State of Missouri's Worker's Compensation Division relating to plaintiff's injury suffered while performing work as an LPN is of no instance in the ALJ's present determination that plaintiff is able to perform his past work as a chauffeur. Cf. <u>Kirby</u>, 923 F.2d at 1327.

C.    <u>Allegations of Pain</u>

In his Complaint, plaintiff claims that he suffers from chronic pain as a result of his rib and spinal injuries and surgery, as well as from muscle paralysis, with such pain evidenced by his use of a TENS unit. A review of the ALJ's decision here shows the ALJ to have considered plaintiff's complaints of pain but to have found such complaints not to be credible. For the following reasons, the ALJ's credibility determination is supported by substantial evidence on the record as a whole.

In determining the credibility of a claimant's subjective complaints, the ALJ must consider all evidence relating to the complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any

precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). Although the ALJ may not discount subjective complaints on the sole basis of personal observation, he may disbelieve a claimant's complaints if there are inconsistencies in the evidence as a whole. Id. The "crucial question" is not whether the claimant experiences symptoms, but whether his credible subjective complaints prevent him from performing work. Gregg v. Barnhart, 354 F.3d 710, 713-14 (8th Cir. 2003). Where an ALJ explicitly considers the Polaski factors but then discredits a claimant's complaints for good reason, the decision should be upheld. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001). The determination of a claimant's credibility is for the Commissioner, and not the Court, to make. Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005); Pearsall, 274 F.3d at 1218.

In this cause, the ALJ identified the Polaski factors and set out numerous inconsistencies in the record to support his conclusion that plaintiff's complaints were not credible. Specifically, the ALJ noted that plaintiff's spinal condition was successfully treated with surgery and that subsequent x-rays showed adequate fusion, and neurological examinations were essentially normal. The ALJ also noted that plaintiff was observed to move around without difficulty and that his physician indicated that plaintiff could be released to work within a short period. See

<u>Ramirez v. Barnhart</u>, 292 F.3d 576, 581 (8th Cir. 2002) (in making credibility determination, ALJ may consider objective medical evidence which is contrary to claimant's assertions).  The ALJ also noted that throughout the medical record, there were recorded instances of plaintiff's exaggeration of symptoms and of inconsistencies between plaintiff's subjective complaints made to his physicians and therapists and their observations of plaintiff's actual movements and functional abilities.  <u>See</u> <u>id.</u> at 582 (ALJ properly questioned authenticity of complaints when physical examinations showed no objective findings to substantiate pain and medical opinions were made that claimant exaggerated pain and symptoms); <u>Russell v. Sullivan</u>, 950 F.2d 542 (8th Cir. 1991) (ALJ's credibility determination must be accepted on record which showed inconsistencies between claimant's complaints of pain and actual observations by treating physicians and therapists, with exaggeration of symptoms noted).  The ALJ also noted that plaintiff was instructed to lose weight, ambulate and become more active in his home exercise program, but that plaintiff did not adhere to these instructions.  <u>See</u> <u>Haley v. Massanari</u>, 258 F.3d 742, 747-48 (8th Cir. 2001) (ALJ properly discredited subjective complaints of disabling symptoms because of failure to follow through with recommended treatment).  Substantial evidence on the record as a whole supports these findings as well as the ALJ's determination that the inconsistencies in the record serve to discredit

plaintiff's complaints of pain.[16]

A review of the ALJ's decision shows that, in a manner consistent with and as required by Polaski, the ALJ thoroughly considered plaintiff's subjective complaints on the basis of the entire record before him and set out numerous inconsistencies detracting from plaintiff's credibility. The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). The ALJ's credibility determination is supported by substantial evidence on the record as a whole, and thus the Court is bound by the ALJ's determination. Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992).

D.    Bowel and Bladder Dysfunction

In his Complaint, plaintiff contends he is entitled to disability due to his bladder and bowel dysfunction. Other than the testimony of plaintiff's spouse at the administrative hearing, no evidence appears in the record of such a condition. Subjective complaints alone cannot constitute a basis upon which to find a claimant disabled. See 20 C.F.R. § 404.1528(a) ("Your statements (or those of another person) alone, however, are not enough to establish that there is a physical or mental impairment.").

---

[16]To the extent plaintiff claims that the severity of his pain is demonstrated by his use of a TENS unit, the undersigned notes that no evidence in the record shows that plaintiff has ever been prescribed a TENS unit. Nevertheless, the use of a TENS unit is not *ipso facto* evidence of a disabling condition. E.g., Russell, 950 F.2d at 545.

Instead, "there must be medical signs and laboratory findings which show . . . a medical impairment(s) which could reasonably be expected to produce the . . . symptoms alleged and which, when considered with all of the other evidence . . . , would lead to a conclusion that [the claimant is] disabled." 20 C.F.R. § 404.1529(a). See also 20 C.F.R. § 404.1508 (to be considered as a basis for disability, a physical impairment "must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [a claimant's] statement of symptoms."). The claimant bears the burden of providing such medical evidence to the Commissioner. 20 C.F.R. § 404.1512.

In this matter, there simply is no evidence other than the statement of plaintiff's spouse that plaintiff suffers a bowel and bladder dysfunction. Indeed, the undersigned notes that at no time during his examinations with any of his treating physicians did plaintiff indicate that he suffered from such dysfunction. See McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993) (failure to seek treatment coupled with medical evidence which shows claimant not to have reported symptoms to physician supports ALJ's adverse determination). Without medical evidence showing the existence of such an impairment, the condition cannot constitute a basis for disability. 20 C.F.R. §§ 404.1508, 404.1528(a).

E.   Major Depression

Finally, plaintiff claims that he is entitled to a finding of disability on account of his diagnosed condition of

- 42 -

major depression.

In determining the severity of a mental impairment, the Commissioner is required to rate the degree of functional loss the claimant suffers as a result of the impairment in the areas of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3).

> When we rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. . . .
>
> . . .
>
> If we rate the degree of your limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will generally conclude that your impairment(s) is not severe . . . .

20 C.F.R. § 404.1520a(c)(4)-(d)(1).

If the mental impairment is determined to be "severe," the Commissioner must then determine if it meets or equals a listed mental disorder. 20 C.F.R. § 404.1520a(d)(2). If the severe impairment does not meet or equal a listed mental disorder, the Commissioner then performs an RFC assessment. 20 C.F.R. § 404.1520a(d)(3).

In this cause, the ALJ summarized the medical evidence of record and, after undergoing the required sequential analysis set

out above, determined plaintiff's mental impairment not to be severe. Specifically, the ALJ acknowledged that plaintiff has had some depression but noted that the evidence failed to show such condition to be severe enough to interfere with plaintiff's ability to engage in work related activities for at least twelve continuous months. The ALJ also noted that the record showed plaintiff's depressive symptoms to have come under control a short time after starting treatment for the condition. As such, the ALJ concluded that plaintiff's mental impairment resulted in no more than slight limitations in plaintiff's social functioning and daily activities, and no more than slight difficulties in maintaining concentration persistence and pace. The ALJ also found plaintiff not to have experienced any repeated episodes of decompensation. (Tr. 14.) Substantial evidence on the record as a whole supports the ALJ's conclusion.

Plaintiff was first diagnosed with depression in October 1999 upon which he was prescribed Prozac which quickly provided benefit to plaintiff. A condition which is controllable through treatment is not considered disabling. Estes, 275 F.3d at 725; Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999). Plaintiff first met with a psychiatrist, Dr. Mattingly, in November 2000 who diagnosed plaintiff with major depression. When plaintiff indicated to Dr. Mattingly that he improved while taking Prozac but nevertheless had dysphoric symptoms, Dr. Mattingly changed the medication to Zoloft. Plaintiff's mood was thereafter continually

noted to be good or okay.  In December 2000 and March 2001, Dr. Mattingly continued plaintiff on Zoloft with no indications of side effects or ineffectiveness.  Indeed, during plaintiff's counseling sessions throughout this period, no depressive signs or symptoms were noted.  Such review of the record supports the ALJ's findings that while plaintiff experienced depression, the condition was not severe and thus not supportive of a finding of disability.

## VI.  Conclusion

In this cause, the ALJ thoroughly and appropriately considered all the evidence of record, including plaintiff's testimony and the testimony of third party witnesses, and determined plaintiff not disabled inasmuch as the evidence failed to demonstrate that plaintiff could not perform his past relevant work as a chauffeur as such work is performed in the national economy.  For the reasons set out above, the ALJ's determination is supported by substantial evidence on the record as a whole and plaintiff's claims of error should be denied.  Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome, or because another court could have weighed the evidence or decided the case differently.  Tellez, 403 F.3d at 958; Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001); Briggs v. Callahan, 139 F.3d 606, 608 (8th Cir. 1998); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993) (quoting Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992)).  Accordingly, the decision of the

Commissioner should be affirmed.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that the decision of the
Commissioner be affirmed and that plaintiff's Complaint be
dismissed with prejudice.

The parties are advised that they have eleven days in
which to file written objections to this Report and Recommendation.
Failure to timely file objections may result in waiver of the right
to appeal questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356, 357
(8th Cir. 1990).


_____
UNITED STATES MAGISTRATE JUDGE


Dated this <u>_10th_</u> day of February, 2006.